My name is L. Sanford Selvey and I'm from Billings, Montana. I represent Marcia Goodbear. We are here before the court today because we have alleged in our brief that the court committed substantive procedural error in applying two different guideline enhancements that were submitted to the court for its consideration in the sentencing of my client, Ms. Marcia Goodbear. One primarily being the use of a weapon and the second the use of a minor. The case here is based on the following facts. Marcia Goodbear was married to Adrian Goodbear. She unfortunately did not realize the violent side of this individual. He was extremely controlling, he was extremely mean, and he had two children, Lyric and Stormy. She had three of her own children and he was a very controlling individual. They lived in a reservation in northern Cheyenne, Lame Deer, Montana. They lived in this very squalid mobile home. It was trashy, there was five children. Mr. Selvey, we're very familiar with the facts of the case. As I understand the guideline calculation, what the district court is supposed to do for this type of an offense is to look to the underlying crime over which the misprison was committed. That's correct. And that means that, as I understand the guidelines, that you actually look at the enhancements that would otherwise be applicable to that underlying offense. Are you maintaining in light of, I think it's our decision in Reagan's, that a belt cannot be a dangerous weapon depending on how it's used? No, sir. We concede that a weapon can be a dangerous weapon depending on how it is used. So why did the district court commit procedural error then when it looked at that issue and decided that the belt had been used in the underlying offense as a dangerous weapon and then, as a result, add that enhancement to Ms. Goodbear's misprison computation? Well, because under misprison, the government tries to shift this burden over to the defense. And I think that that's impermissible. And what the government continues to and what they try to put into the brief and did put into the brief continually was that somehow the misprison related to the murder of this young girl. That's the question I'm asking you. Isn't that what the guideline tells the district court to do? But it was in reference to an aggravated assault. And the government tries to go to the murder aspect of it. But whether the government pled this case in the way they presented it to the grand jury is under the aggravated assault. And what is true, but under Application Note 1 to 2X4.1, not all specific offense characteristics will apply to misprison offense. Only those specific offense characteristics that were known or should have been known to the defendant. Okay, so let me ask a question about that. First, I just had a procedural question. I thought that the maximum for misprison was 36 months. That's correct. And how did it get to 37? Judge, I don't quite understand that. And no one realized that until after everything was over and the smoke cleared. And I'm not sure how it got there. Well, maybe for starters, it seemed to me that under the law, if it's supposed to be 36, that as I understand it, your client is due for release in under a year. And even if there weren't additional relief from this court, and I'll ask the U.S. attorney as well whether it really should be 36 and he should not be in prison for 37. Because she's scheduled for release in October 212. Right, 212. So let me go back to the question related to Judge Tallman and what you're saying. And that has to do with, you know, new or should have known of these events. It seemed to me that with respect to the belt, that it was the son, not the mother, who actually saw that. That's correct. But I didn't actually see argued in the briefs an argument that because the mother didn't know and shouldn't have necessarily known how the belt was used, that that would essentially vitiate the sentencing enhancement. Would you comment on that? Well, the way we presented it to the district court was, and we argued very strongly in our sentencing memorandums was, that the only evidence that there was from the government that a belt was used is that Kyle, my client's 13-year-old son, who was outside of the mobile home, presumably had looked into the window and had seen Adrian using a belt. There was no other testimony whatsoever. The government never even seized the belt as evidence. But all they did was take that statement that he saw him using a belt. My client, meanwhile, is on the inside of the mobile home. I understand. Outside of the door. She's not knowing what physically is going on inside. Here's the baby crying. You don't think the district court could infer from the screaming and the sounds that she heard through the bedroom door of the mobile home that a belt was being used during the assault? With all due respect, no, Your Honor, because what she heard was a screaming, and she heard crying, and then after Adrian opens the door, and it's in the government's brief because that is the facts, he comes out and says, Oh, I need your help because I just beat Lyric, and she's unconscious. My client was sent to do CPR. But the government talks about the use of the belt and then submits photographs and then says, Oh, look at the photographs. You can see severe bruising, and it's consistent with the belt. So there's no doubt the belt was used. There's no doubt the belt could basically be characterized as that kind of a weapon. The question then is knowledge. Right. Is that what you argued? Didn't you argue in your brief that there wasn't sufficient evidence that the belt was actually used? No. We argued – yes, sir, you're correct. We argued because there's an autopsy report. The government never submitted the autopsy report. They refer to the autopsy report as to what the cause of death was, which was blunt force trauma to the head and to the body, and it is consistent with kicking and beating. There's absolutely nothing in the autopsy report. I know you argued that, but did you also make the argument that it wasn't reasonably foreseeable or that she didn't know at the time she lied to the police that a belt had been used? That's correct. I don't see how it is reasonable for her to assume or to know what Adrian's doing behind a closed door. Did you make that argument or was your argument that there isn't sufficient proof that the belt was actually used? No. We made the argument that she could not reasonably have foreseen that a belt was used in the manner that the government claims it was used, and the government said that they don't have the proof. You're sort of collapsing your arguments, I guess, is the way you're saying it. I thought your argument was that the belt was not used as a dangerous weapon within the meaning of the enhancement. No, what we suggested was is that the government introduced no evidence to indicate that the belt was used in a fashion that caused serious bodily injury. We know nothing about this belt. We don't know how it was used. The son saw the belt being used during the assault, and the district court was obviously heavily influenced by the photograph of the victim's body and the damage that was obvious from the photograph. Why is the district court not permitted to conclude that the use of that belt during the assault contributed to the murder? I think if the government had introduced the autopsy report for number one, and they should have. The autopsy report is in evidence, isn't it? We have it. Well, that doesn't go to whether her knowledge is independent, presumably, unless it's imputed. The son definitely knows. We know what was used. We know that from later testimony from the autopsy and from the son. So we know what was used. We know that it qualifies under the enhancement. The question is her knowledge. That's the point here is how is it reasonable for her to know that a belt was used? You don't think that her viewing of the body, which apparently she had more than an hour based on the testimony before help arrived, would be sufficient for the district court to infer circumstantially, given the fact that she actually cleaned up the crime scene before help arrived, that she wouldn't know that the belt had been used? I don't think that Marsha Goodbear is qualified to know what was or what wasn't used. All she was qualified to do was when he finally opened the door and said to her, I just beat Larry. I guess I'm having a hard time accepting the argument when the crime occurred in a mobile home, and there's no question that she heard the sounds coming from within. When she was there immediately after he opened the bedroom door, was with the victim for hours, actually, if you include all the time she spent at the hospital, why can't the district court, based on that circumstantial evidence, conclude that she knew or had reason to know that the belt was used? Well, number one, Your Honor, with all due respect, she can't see through the door. She doesn't know what agent is doing or using or otherwise. She did not know anything about Kyle having viewed through the window from the outside that the belt had even been used until after she got the discovery. And I do take exception, Your Honor, to the fact that she cleaned up immediately after the offense occurred because that wasn't a fact. And that was part of the reason why the government dismissed the accessory after the fact, is because they could not prove that she cleaned anything up of any material evidence. And during one of the interviews, either to the FBI or the tribal police. Correct. But the timing of the cleaning was after she had already gone to Lame Deer Hospital, flown with the child to Billings, and then she came back to Lame Deer. And at that time, the FBI had already been in the mobile home. They had already searched through it. They had seized whatever evidence they thought was relevant. Maybe I'm misreading the record. Maybe the government can help me on the chronology. Her cleaning occurred afterwards. What Adrian did during the time that she was in Billings. I thought there was testimony that they actually changed the clothing of the victim before the. . . I think Adrian might have, yes. But she was in the room for about a half an hour trying to resuscitate. She was trying to resuscitate the child. Wouldn't she hear. . . I mean, hitting someone with one's fist or foot sounds different than hitting someone with a belt. Again, it's the government's proof to show that she reasonably knew or should have known that he used a belt. If the district court relied upon the son's testimony that he saw him using a belt and she's in a small area just on the other side of a door, there's no evidence of any soundproofing, and she hears what's going on, wouldn't it be reasonable to assume that she would have heard what sounded like a belt or a strap striking the child? But that's pure speculation. She never knew that a belt was used. Circumstantial evidence. Again, she did not know what happened behind closed doors. Let's hear from the government. You've exceeded your time. Thank you. Can I ask you about the length of the sentence so we take care of that first? Did that have anything to do with the fact that she was also convicted of assaulting S. Stormy? I believe so, Your Honor. I think my understanding of the calculation of the guidelines is that it resulted in a total offense level of 19, which gave a range of 30 to 37 months. That included a one-unit increase when you take into account both counts. That's a five-year offense, is it not? Yeah. Her sentence was under misprison? That's correct. Which is a 36-month offense, max? Under the total offense level of 19. Well, I'm asking you, what is the maximum offense level for misprison? Is it 36? For the misprison by itself. Yeah. Okay. Statutory max. Statutory max. I don't have that in front of me. I'm sorry? I don't have that in front of me. Okay. To the extent there could be an error, the two of you can talk about that separately, which is not really on appeal, but it is something that jumped out, and I wondered where it came from because it wasn't explained. But she also pleaded guilty to assaulting Stormy? She did. And so in theory, Your Honor, those could have been. Right. Let's go to the new or should have known. In your view, during what time period is it appropriate to look at that? I would suggest, Your Honor, that the entire time period would be appropriate to look at. First of all, I would back up and I would clarify that my reading of Ms. Goodbear's arguments on appeal is that the belt was not used in a manner to cause serious bodily injury, which, first of all, I believe is the inquiry standard. But the issue of whether or not Ms. Goodbear should have known, knew or should have known that the belt was used, I believe, has not been raised in this appeal and is waived. And I think that's important for a number of reasons, one that it could have, if raised, it would have been addressed in the brief and some parts of the record could have been fleshed out, for Your Honor's clarification. Well, the argument was also raised that there's no proof that the belt was actually used. I don't believe that there's any dispute that the belt was used. The PSR did find that the belt was used. The court adopted those findings. The court explicitly said during the sentencing and in the record that the belt had been used. But I thought they were challenging those findings. The only evidence, square evidence, that the belt was used comes from the son's observations and then observation of the body, but there was no expert that testified these were belt marks. The evidence was that the son had stated that he saw use of the belt. That was in the PSR. The judge made that finding that the belt was used to beat Lyric. That was not challenged in the district court. I don't believe that that's the basis of the issue in this appeal. My understanding is that the manner in which the belt was used was not clarified or the judge didn't make any specific findings as to when the belt was used, how many times it was used, and the manner it was used. But I did not read the brief to suggest that they were contesting that the belt was used at all. I didn't read that in the transcript of the sentencing hearing either. The district judge was resolving the defense objection to the characterization of the belt as it was used, not a challenge to the fact that it was never used. That's correct, Your Honor. If you look at the record, the judge addressed the objection with regard to the manner in which the belt was used, not the underlying fact that the belt had been used and that Kyle had seen that. With regard to the knowledge issue, again, our initial position is that that issue has been waived in this appeal. Beyond that, I would note that the standard to keep in mind is not whether or not Ms. Goodbear knew. It's whether she knew or reasonably should have known that the belt was used. In all of the circumstances that Judge Tallman and Judge Moskowitz, you have pointed out, I think the district court, even though he didn't explicitly make this finding, the district court could have inferred that Ms. Goodbear reasonably should have known that the belt was used, based on the injuries, the extent to which she clearly saw over the course of the events of that night. There's testimony in the record that after the beating, she helped Adrian Goodbear with Lyric's body and trying to resuscitate her. The evidence is that she was naked, I believe, during some or all of that period, and that, in fact, they changed her clothes. The victim was naked? Yes. Yeah, and that they put clothes on her before they called her out. And further, the record does show that I think it's pretty clear that Ms. Goodbear admitted, during the course of the proceedings, that she cleaned the room in the aftermath of the events. She did so in a taped statement to the FBI. But when did she clean it? Well, that makes sense. If the defendant, if Adrian's story was she fell from a tree, you better clean up the blood in the bedroom or whatever the crime scene looked like, because otherwise the police aren't going to buy my story that these terrible injuries came from a fall from a tree outside the house. That's correct, Your Honor. And I believe that the statement she gave was that she was directed by Adrian to go back into the room to clean up some of the bloody clothing and that. So that would go against any suggestion that the police had been there, had seized evidence. I believe Mr. Selvey noted that the belt, there's no evidence that the belt had been seized. So if the belt was there, then it would still have been there at the time that Ms. Goodbear cleaned the room. I would specifically point to the excerpts of the record at page 65. That's the change of plea hearing. Ms. Goodbear, during the change of plea hearing, did admit to the judge that she did clean the room after the fact. Again, that's in addition to the PSR, which notes that she provided a taped statement to the FBI acknowledging that fact. That wasn't days later after the victim had been airlifted to Children's Hospital in Denver and declared dead. Correct. If not, it was within that time. All of this was continuous at the time. Exactly. I believe the record shows that after she was at the hospital, that's when she went back to clean the room. The other point I would note, Your Honors, with regard to- Even if it was after the transportation, that would be a further point at which she was committing the misprison of the felony by getting rid of evidence. Exactly. So what she knew at the time she's committing the misprison of felony offense is what counts. Correct, Your Honor, which extends throughout that entire period. I would also note to Your Honors that the autopsy report was submitted to the district court and is part of the underlying record in this case. While it hasn't been submitted in this appeal as an exhibit, it was exhibit number one to the sentencing proceedings- Along with the autopsy photo. Excuse me? Along with the photos of the victim. Yes, Your Honor. And this brings me back to the waiver argument. Had this issue been raised on appeal, the government could have, for instance, referred to the autopsy report. I think Mr. Selvey said there's nothing in the autopsy report that indicates any injuries from the belt. I believe that that is incorrect, that there were linear abrasions that the judge could have inferred from were injuries. Well, the judge specifically says on the record that he looked at the pictures, so he certainly was aware of that evidence. Yes, Your Honor. He certainly was aware of that. He admitted it as exhibits to the sentencing so that it could be part of this record on appeal, knowing that with the express intent that Your Honors could see what he saw if Your Honors wanted to. But again, I think the fact that there were injuries that were visible both goes to the argument that's raised in this appeal about the manner in which the belt was used. I think the fact that there were such injuries really closes the case as far as the belt was used to cause bodily injury, as well as her knowledge of it, since she would have seen those injuries. And with regard to the use of the minor, is it the government's theory that because of the fact that she told the same story that Kyle tried to tell initially about the fall from the tree, that she knew or should have known that Adrian was using the 13-year-old to further his alibi or false explanation for what had actually happened? That's correct, Your Honor. And with regard to that issue, the judge did make an explicit finding of fact that or determination that such knowledge should be attributed to Ms. Goodbear. I would direct Your Honors to the excerpts of record at page 145. There the judge really goes into why it is he feels that she should have known, knew or should have known that Kyle, excuse me, that Adrian had directed Kyle to lie, based on what Your Honor just stated, that the stories were identical. Well, apparently he directed her as well because she told the same story the first time around, didn't she? Correct. And that's the basis for the misprision, that's the affirmative act that's needed as an element of the misprision, which is that she lied to the police in the initial statement that she provided, saying that Lyric had fallen out of the tree. And the judge correctly inferred from that that Kyle, she would have known that Kyle was telling the same story. And that's common sense. She wouldn't have given that statement if she knew or thought that Kyle might say something different. So I think there's some suggestion in that that they got their story straight since it was derived from Adrian. Thank you. Thank you, Your Honor. You may have a minute for rebuttal if you need that. To crack the record, there was no blood to be cleaned up. The injuries were all internal. Counsel, I am concerned about the fact, I mean, you should know the facts better than I do, and the cleanup didn't occur days later. I mean, she admitted to the investigators that she cleaned the crime scene. Was that just a misrecollection on your part or are you trying to mislead me? No, sir, Judge. What happened was that she was in Billings. Adrian went back to the mobile home. He might have attempted to clean certain things up. When she got back later that afternoon. She did not admit to the investigators after they interviewed her or during the interview that she cleaned the crime scene. When they interviewed her on February the 19th of 2010. Counsel, that's a yes or no question. Did she or did she not make that admission? She admitted that she cleaned it after the FBI had already been there. So she did make an admission. To clean the room up after the law enforcement had already been there, immediately at the time that the crime occurred, hours before, or days later. It did not happen at the time of the crime. Thank you. The case just argued is submitted. Thank you for coming from Montana.
judges: Moskowitz, McKeown, Tallman